**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

UNITED STATES OF AMERICA,           )
                                    )
            Plaintiff,              )
                                    )
v.                                  )        Case No.  21-CR-00553-GKF
                                    )
JOEL RICHARD SMITH and              )
AMANDA IRENE SMITH,                 )
                                    )
            Defendants.             )

## OPINION AND ORDER

This matter comes before the court on the Motion to Suppress Evidence [Doc. 61] of defendant Amanda Irene Smith, which defendant Joel Richard Smith has joined [Doc. 145], and the Motion to Suppress Illegally Obtained Evidence [Doc. 122] of Mr. Smith, in which Mrs. Smith has joined [Doc. 145].  For the reasons set forth below, the motions are granted in part and denied in part.

### Background/Procedural History

On April 18, 2019, Mr. and Mrs. Smith were charged with child neglect and child abuse in the District Court in and for Mayes County, State of Oklahoma.  A preliminary hearing was held in the state court on October 7 and 10, 2019.  On June 16, 2021, the state-court charges against the Smiths were dismissed based upon the U.S. Supreme Court's decision in *McGirt v. Oklahoma,* 140 S. Ct. 2452 (2020).

On December 20, 2021, a federal grand jury returned an Indictment charging Mr. Smith with one count of Child Abuse in Indian Country pursuant to 18 U.S.C. §§ 1151, 1153, and 2 and Okla. Stat. tit. 21, § 843.5(A) and one count of Child Neglect in Indian Country pursuant to 18 U.S.C. §§ 1151, 1153, and 2 and Okla. Stat. tit. 21, § 843.5(C).  The Indictment also charged Mrs.

Smith with one count of Child Abuse in Indian Country pursuant to 18 U.S.C. §§ 1151, 1152, 13, and 2 and Okla. Stat. tit. 21, § 843.5(A) and one count of Child Neglect in Indian Country pursuant to 18 U.S.C. §§ 1151, 1152, 13, and 2 and Okla. Stat. tit. 21, § 843.5(C).  [Doc. 2].

On July 18, 2022, a grand jury returned a Superseding Indictment charging Mr. Smith with one count of Child Abuse in Indian Country pursuant to 18 U.S.C. §§ 1151, 1153, and 2 and Okla. Stat. tit. 21, § 843.5(A) and one count of Child Neglect in Indian Country pursuant to 18 U.S.C. §§ 1151, 1153, and 2 and Okla. Stat. tit. 21, § 843.5(C).  The Superseding Indictment also charges Mrs. Smith with one count of Child Abuse in Indian Country pursuant to 18 U.S.C. §§ 1151, 1152, 13, and 2 and Okla. Stat. tit. 21, § 843.5(A) and one count of Child Neglect in Indian Country pursuant to 18 U.S.C. §§ 1151, 1152, 13, and 2 and Okla. Stat. tit. 21, § 843.5(C).  [Doc. 85].  The charges relate to alleged victim H.M., a child under the age of eighteen.[1]  Trial of this matter is scheduled to begin on June 20, 2023.  [Doc. 128].

In advance of trial, Mrs. Smith filed a motion seeking to suppress evidence obtained during three separate entries into the residence that Mrs. Smith jointly occupied with Mr. Smith, that occurred on April 5, 2019.  [Doc. 61].  Mrs. Smith also seeks to suppress "any later-obtained evidence tainted by the search."  [*Id.* at p. 1].  Additionally, Mr. Smith filed a separate motion seeking to suppress evidence obtained during two of the three April 5, 2019 entries into the Smith residence, as well as a subsequent search conducted pursuant to a warrant on April 17, 2019.  [Doc. 122].  Mr. Smith also asks that law enforcement, or any other witness, be prohibited from testifying about the retrieval or existence of any evidence obtained.  [*Id.* at p. 7].  Mr. and Mrs. Smith have joined the other's respective motion.  [Doc. 145].  The government separately responded in

---

[1] Although the Superseding Indictment refers to "M.V.," or "Minor Victim," there appears to be no dispute that H.M. is the relevant victim.

opposition to each motion.  [Doc. 132; Doc. 137].  Thus, the motions are ripe for the court's determination.

Neither the Smiths nor the government has requested an evidentiary hearing.  [Doc. 61; Doc. 122; Doc. 132; Doc. 137].  In his motion, Mr. Smith states he "believes the Court can decide the matter on the pleadings."  [Doc. 122, p. 7].  The government concurs in response.  [Doc. 137, p. 11].  Having reviewed the briefs and evidence in this matter, and in light of the fact that a hearing has not been requested, the court concludes that the motions may be decided on the briefs and a hearing is unnecessary.

## Relevant Facts

On April 5, 2019, Mayes County Sheriff's Deputy Brittney Burnett was dispatched to a residential address on South 4450 Road, Mayes County, Oklahoma in reference to a missing child.  [Doc. 132-1, p. 14; Doc. 132-3, p. 97].  While en route to the call, Deputy Burnett received a second call from a different reporting party, Jennifer Puckett, who advised that a nine-year-old female had walked up to Ms. Puckett's residence, located on East 540 Road, Mayes County, Oklahoma.  The minor female stated that she was hungry and that her parents did not take care of her.  [Doc. 132-1, p. 15; Doc. 132-3, pp. 77 and 97].  The age and description of the child matched the original call and was in close proximity to the original address.  [Doc. 132-1, p. 15; Doc. 132-3, p. 97].  Deputy Burnett advised that she would be en route to the second address to check on the welfare of the child.  [Doc. 132-1, p. 15].

Upon arrival at the East 540 Road address, Deputy Burnett spoke with Ms. Puckett.  [Doc. 132-1, p. 15; Doc. 132-3, p. 98].  After speaking with Ms. Puckett, Deputy Burnett went inside the Puckett residence and spoke with H.M.[2]  Deputy Burnett observed that H.M. smelled of urine and

---

[2] H.M. initially advised that her name was "O—."  [Doc. 132-1, p. 15].  However, it was subsequently determined that O—'s legal name was H.M.  [Doc. 132-1, pp. 15 and 20].

feces, appeared unwashed, and had red patches of skin covering her forearms.  [Doc. 132-1, p. 15; Doc. 132-3, pp. 98-99].  Deputy Burnett asked H.M. if she needed help getting home.  [Doc. 132-1, p. 16; Doc. 132-3, p. 99].  Deputy Burnett reported that H.M. became almost fearful, began to cry, and stated that she did not want to go home.  [Doc. 132-1, p. 16; Doc. 132-3, pp. 99-100].

Deputy Burnett then stepped outside of the residence to call the Oklahoma Department of Human Services.  [Doc. 132-1, p. 16].  While Deputy Burnett was on the phone with DHS, Deputy Corbin Peters arrived, entered the Puckett residence, and made contact with H.M.  [Doc. 132-1, p. 16; Doc. 132-3, p. 101].

After Deputy Burnett's call, Deputy Burnett and Deputy Peters made contact with H.M. together.  [Doc. 132-1, p. 16; Doc. 132-3, p. 101].  Deputy Peters asked H.M. about injuries and H.M. pulled her right pant leg up.  The deputies observed a laceration encircling H.M.'s ankle that appeared to be infected.  H.M. was asked what caused the injury and she stated handcuffs.  [Doc. 132-1, p. 16; Doc. 132-3, pp. 101-02].  H.M. later described the handcuffs as silver and metal like the ones used by law enforcement.  H.M. stated that the handcuffs were kept on a dresser in her parents' bedroom.  [Doc. 132-1, p. 16; Doc. 132-3, p. 103].  Deputy Peters radioed dispatch to contact the Mayes Emergency Services Trust Authority (METSA) to send paramedics.  [Doc. 132-1, p. 16; Doc. 132-3, pp. 102-03].

Deputy Burnett and Deputy Peters then left the Puckett residence and traveled to the 4450 Road address, where the Smiths resided.  [Doc. 132-1, p. 16; Doc. 132-3, p. 103].  The Smiths were standing outside of the residence when the deputies arrived.  [Doc. 132-1, p. 16; Doc. 132-3, p. 104].  Deputy Burnett did not see any indication that either of the Smiths were intoxicated. [Doc. 132-3, p. 105].

At the time she arrived at the house, Deputy Burnett was wearing the Class A uniform which includes a polo shirt with an internal vest and a badge on the chest. [Doc. 132-3, p. 105]. Deputy Burnett was also wearing a firearm and handcuffs. [Doc. 132-3, pp. 105-06].

Deputy Burnett advised the Smiths that H.M. had been found, that DHS had been contacted, and that METSA was en route to check H.M. out. [Doc. 132-1, p. 16; Doc. 132-3, p. 106]. Deputy Burnett further advised that H.M. was in a safe location and would remain there until further notice. [Doc. 132-1, p. 16]. Deputy Burnett then had to step away to take a phone call, but Deputy Peters continued to speak with both Mr. and Mrs. Smith. [Doc. 132-1, pp. 16-17 and 20].

Deputy Burnett subsequently returned and asked Mrs. Smith if she and Deputy Peters could conduct a cursory safety check of the residence to assess the living conditions. [Doc. 132-1, pp. 17 and 20; Doc. 132-3, p. 110]. Mrs. Smith responded that the house was dirty. [Doc. 132-1, p. 17]. Deputy Burnett informed Mrs. Smith that, before H.M. could be released to her custody, a check would have to be completed, but that they could wait until the DHS investigator arrived to do so. [Doc. 132-1, p. 17; Doc. 132-3, p. 110]. Mrs. Smith advised that the deputies could enter the residence at that time and escorted them inside. [Doc. 132-1, pp. 17 and 20; Doc. 132-3, pp. 110-11]. Mr. Smith followed the deputies and Mrs. Smith inside. [Doc. 132-1, p. 17; Doc. 132-3, p. 111].

Once in the home, Deputy Peters asked Mrs. Smith the location of H.M.'s room. [Doc. 132-1, p. 20]. Mrs. Smith escorted the deputies down the hall to a bedroom on the left and opened the door. [Doc. 132-1, pp. 17 and 20; Doc. 132-3, p. 113]. The deputies observed a pack and play with holes cut in the mesh. [Doc. 132-1, pp. 17 and 20].

After exiting the room, Deputy Burnett asked Mrs. Smith about the room directly across from H.M.'s room. Mrs. Smith explained it was the junk room. Deputy Burnett asked if she could look inside and Mrs. Smith advised that she could. [Doc. 132-1, p. 17; Doc. 132-3, p. 113]. After looking in the junk room, Deputy Burnett asked Mrs. Smith what the next room was. Mrs. Smith responded it was her and Mr. Smith's bedroom. Deputy Burnett asked if she could look in the room, and Mrs. Smith advised yes. [Doc. 132-1, p. 17; Doc. 132-3, p. 113]. While in the Smiths' bedroom, the deputies observed a pair of metal handcuffs, silver in color, on the top of a dresser. [Doc. 132-1, pp. 17 and 20]. The deputies exited the bedroom, and opened the door to the bathroom. [Doc. 132-1, p. 17]. After observing the bathroom, Deputy Peters, Deputy Burnett, and the Smiths exited the residence. [*Id.*].

Deputy Burnett left the Smith residence to meet with METSA. [Doc. 132-1, p. 17]. Later that same day, Deputy Burnett returned to the Smith residence with DHS Investigator Rhonda Wood. [Doc. 132-1, pp. 17-18]. Investigator Wood entered the Smith residence to conduct a walk through with Mrs. Smith. Deputy Burnett accompanied them. [Doc. 132-1, p. 18; Doc. 132-3, pp. 123, 157-58]. During the second entry, the handcuffs had been moved from the dresser in the Smiths' bedroom. [Doc. 132-1, p. 18; Doc. 132-3, pp. 126-27].

Deputy Burnett, Investigator Wood, and Mrs. Smith exited the residence and asked Mr. Smith where the handcuffs were. Mr. Smith stated that he would go get them and Deputy Burnett told Mr. Smith that she would go with him. [Doc. 132-1, p. 18]. Inside the residence, Deputy Burnett observed Mr. Smith retrieve two sets of handcuffs from the pocket of a pair of military fatigues in the back of his closet, which he handed to her. [*Id.*]. Mr. Smith informed Deputy Burnett that he had moved the handcuffs. [*Id.*].

Afterward, Deputy Burnett spoke with the Smiths and received voluntary statements. [*Id.* at p. 21]. Investigator Wood and Deputy Burnett then departed the Smith residence. [*Id.*]. The Smiths were not arrested.

On April 17, 2019, Deputy Burnett executed an Affidavit for Search Warrant related to the Smith residence that specifically sought:

> A white and blue in color Pack N' Play, a [*sic*] livestock sorting tools, often referred to as "flags, buggy whips, paddle, sticks, etc," brooms, diapers or items that could have been used, and any device on which information can be stored digitally or electronically, and letters and mail that proves residency.

[Doc. 137-4]. Rebecca Gore, District Judge of Mayes County, issued the warrant that same day. [Doc. 137-5]. The warrant was executed on April 19, 2019. [Doc. 137-6].

## Analysis

As previously stated, the Smiths challenge the constitutionality of each of the three entries into the Smith residence on April 5, 2023. [Doc. 61; Doc. 145]. Additionally, the Smiths challenge the validity of the April 19, 2023 search conducted pursuant to search warrant. [Doc. 122; Doc. 145]. The court separately considers each entry/search.

### A.    First Entry

Mrs. Smith does not dispute that she consented to the deputies' first entry into the residence. [Doc. 61, p. 6 ("Amanda then permits the Deputies' entry.")]. However, Mrs. Smith contends that her consent was constitutionally involuntary. [*Id.* at pp. 5-7]. Mr. Smith also argues that the consent was constitutionally involuntary and further contends that he did not consent. [Doc. 122, pp. 3-5].

The Fourth Amendment protects "[t]he right of the people to be secure in their persons [and ] houses . . . against unreasonable searches and seizures." U.S. Const. amend. IV. Under well-established Tenth Circuit precedent, "[i]t is beyond question that the . . . officers' entry into

7

the home constituted a search for purposes of the Fourth Amendment—no matter how limited it was in scope." *United States v. Jones*, 701 F.3d 1300, 1317 (10th Cir. 2012); *see also Payton v. New York,* 445 U.S. 573, 585-86 (1980) (quoting *United States v. U.S. Dist. Ct.,* 407 U.S. 297, 313 (1972)) ("The 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'").[3]  "A warrantless search of a home is presumptively unreasonable, and evidence obtained from such a search is inadmissible, subject only to a few carefully established exceptions." *United States v. Harrison*, 639 F.3d 1273, 1278 (10th Cir. 2011).  "Voluntary consent to search is one such exception." *Id.*  "'Voluntary consent' consists of two parts: (1) the law enforcement officers must receive either express or implied consent, and (2) that consent must be freely and voluntarily given." *Jones,* 701 F.3d at 1317.  The government bears the burden as to each part, *id.,* and the burden is a preponderance of evidence. *United States v. Zubia-Melendez*, 263 F.3d 1155, 1160 (10th Cir. 2001).

As previously stated, Mr. Smith argues that the first part of the "voluntary consent" inquiry is not satisfied because he did not consent to the search.  "To satisfy the first prong of the voluntariness requirement, a defendant's consent must be clear, but it need not be verbal." *United States v. Guerrero,* 472 F.3d 784, 789 (10th Cir. 2007).  Instead, consent may be indicated "through gestures or other indications of acquiescence, so long as they are sufficiently comprehensible to a reasonable officer." *Id.* at 789-90.  Implied consent to search is no less valid than express consent to search. *Jones*, 701 F.3d at 1321.

Mr. Smith suggests that, because Deputy Burnett did not explicitly ask his permission to enter the residence, the voluntary consent exception to the warrant requirement is inapplicable.

---

[3] "It is 'well established in this circuit that in federal prosecutions the test of reasonableness in relation to the Fourth Amendment protected rights must be determined by *Federal law* even though the police actions are those of state police officers.'" *Jones*, 701 F.3d at 1309 (emphasis in original) (quoting *United States v. Green*, 178 F.3d 1099, 1105 (10th Cir. 1999)).

The U.S. Supreme Court has held "that a physically present inhabitant's *express refusal* of consent to a police search is dispositive as to him, regardless of the consent of a fellow occupant." *Georgia v. Randolph,* 547 U.S. 103, 122-23 (2006) (emphasis added).  In that case, the Court, admittedly "drawing a fine line," recognized that "the potential objector, nearby but not invited to take part in the threshold colloquy, loses out." *Randolph,* 547 U.S. at 121.  Federal Circuit Courts of Appeal have uniformly interpreted *Randolph* narrowly, requiring an explicit objection.  *See United States v. McKerrell,* 491 F.3d 1221, 1227 (10th Cir. 2007); *United States v. Watkins*, 760 F.3d 1271, 1281 (11th Cir. 2014) (collecting cases); *see also Fernandez v. California,* 571 U.S. 292, 300 (2014) (characterizing *Randolph* as a "narrow exception" to the general rule that consent by one resident of jointly occupied premises is sufficient to justify a warrantless search).

Mr. Smith presents no evidence that he explicitly objected to the deputies entering the residence.  Rather, the undisputed evidence demonstrates that, when Deputies Burnett and Peters arrived at the Smith residence, both Mr. and Mrs. Smith were standing outside of the home.  Initially, both Deputy Burnett and Deputy Peters spoke to the Smiths.  Although Deputy Burnett stepped away to take a phone call, Deputy Peters continued to speak with both Mr. Smith and Mrs. Smith.  Deputy Burnett then reapproached and asked Mrs. Smith if she and Deputy Peters could enter the house.  Mrs. Smith ultimately agreed and led the deputies inside.  Mr. Smith followed the deputies and Mrs. Smith inside.

The undisputed evidence demonstrates that Mr. Smith was physically present nearby, but did not expressly refuse consent.  As such, he "loses out" and the narrow exception to a co-occupant's consent recognized in *Randolph* is inapplicable.  Mrs. Smith's consent is therefore dispositive.

Moreover, the evidence demonstrates that Mr. Smith impliedly consented to the deputies' entry. As previously stated, consent may be indicated "through gestures or other indications of acquiescence, so long as they are sufficiently comprehensible to a reasonable officer." *Guerrero*, 472 F.3d at 789-90. Mr. Smith never told the deputies that he did not want them to enter the residence. Mr. Smith then followed the deputies into the residence and did not object as Mrs. Smith opened four separate doors in the home. These "are not actions that a reasonable officer would have interpreted as signaling [Mr. Smith's] refusal of the officers' entry into his residence," but instead would be reasonably construed as consent. *See Jones*, 701 F.3d at 1321.

As previously stated, in her motion (which Mr. Smith has joined), Mrs. Smith concedes that she consented to the officers' entry but argues that the consent was constitutionally involuntary. As previously stated, "consent must be freely and voluntarily given." *Jones,* 701 F.3d at 1317. "The government bears the burden of proving that consent is given freely and voluntarily." *Harrison,* 639 F.3d at 1278. "[T]he question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Id.* (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973)).

> When considering the totality of the circumstances, some of the relevant considerations include:
>
> "Physical mistreatment, use of violence, threats, promises, inducements, deception, trickery, or an aggressive tone, the physical and mental condition and capacity of the defendant, the number of officers on the scene, and the display of police weapons. Whether an officer reads a defendant his *Miranda* rights, obtains consent pursuant to a claim of lawful authority, or informs a defendant of his or her right to refuse consent also are factors to consider in determining whether consent given was voluntary under the totality of the circumstances."

*Jones,* 701 F.3d at 1318 (quoting *Harrison,* 639 F.3d at 1278).

Mrs. Smith argues that her consent was involuntarily obtained for three primary reasons: (1) Deputy Burnett's alleged use of deception as to the purpose of her entry; (2) Deputy Burnett's statements reflect an attempt to coerce using an implied claim of lawful authority; and (3)  an implied threat that H.M. would not be returned to Mrs. Smith unless she acquiesced.

Looking first to Mrs. Smith's claim of deception, Mrs. Smith contends that Deputy Burnett "had no authority to stand in for DHS to perform such a safety check" and therefore the deputy misrepresented the purposes of her entry.  Assuming that Deputy Burnett lacked authority to stand in for DHS and perform a safety check such that her representation was deceitful, although the Tenth Circuit has recognized that "deception and trickery are among the factors that can render consent involuntary," "not all deception or trickery will render a search invalid."  *Harrison,* 639 F.3d at 1278; *see also Jones,* 701 F.3d at 1319 n.9 ("[A]lthough it is a relevant consideration in the consent calculus, the use of deception is not categorically unlawful.").  Consent will generally be unlawful if the deception is calculated to give the impression of imminent danger.  *See Harrison,* 639 F.3d at 1279 (agents' statements implied that a bomb had been placed in defendant's apartment); *see also United States v. Connor*, No. 19-CR-58-JED, 2019 WL 6050722, at *8 (N.D. Okla. Nov. 15, 2019).  Here, any deception was of a different kind or degree as Deputy Burnett did not utilize deception or trickery to suggest that the Smiths were in imminent physical danger. *See United States v. Easley,* 911 F.3d 1074, 1081 (10th Cir. 2018).

Further, the Tenth Circuit has characterized the "operative question" as "whether 'deceit or trickery is used to imply an individual *has no ability to refuse consent*.'"  *United States v. Woody*, 45 F.4th 1166, 1176 (10th Cir. 2022) (emphasis added).  After requesting Mrs. Smith's consent, Deputy Burnett advised Mrs. Smith that they could wait until the DHS investigator arrived to perform the check.  Under the circumstances, a reasonable person would understand that he or

she could refuse Deputy Burnett's request for consent.  Based on the foregoing, while the court may consider any trickery or deception, it is not conclusive, particularly given that Deputy Burnett was truthful in her representation to Mrs. Smith that she wanted to assess the living conditions.[4]

The court next turns to Mrs. Smith's claim that Deputy Burnett's statements to her reflect an attempt to coerce using an implied claim of authority—that is, that a check would have to happen either way.  [Doc. 61, p. 6].  At the time, under Oklahoma law, "[a]ny county office of the Department of Human Services receiving a child abuse or neglect report shall promptly respond to the report by initiating an investigation of the report or an assessment of the family in accordance with priority guidelines established by the Department."  Okla. Stat. tit. 10A, § 1-2-105(A)(1).[5] "The investigation or assessment shall include a visit to the home of the child, unless there is reason to believe that there is an extreme safety risk to the child or worker or it appears that the referral has been made in bad faith."  Okla. Stat. tit. 10A, § 1-2-105(B)(1).  Accordingly, Deputy Burnett's assertion that an assessment of the living conditions would have to occur was not baseless.  Further, Mrs. Smith's contention that Deputy Burnett implied that the deputies would have to perform the search is undercut by Deputy Burnett's statement to Mrs. Smith that they could wait until the DHS investigator arrived to perform the check.  Thus, this factor does not suggest that Mrs. Smith merely acquiesced to a claim of lawful authority.

Finally, Ms. Smith argues that Deputy Burnett's request included an implied threat that H.M. would not be returned unless she acquiesced to the entry, a situation of which Mrs. Smith says "[s]uch a choice is no choice at all."  [Doc. 61, p. 6].  However, as set forth above, a home

---

[4] There is no evidence that Deputy Burnett or Deputy Peters did anything beyond assessing the residence during the first entry.

[5] Deputy Burnett reported the abuse to the Oklahoma Department of Human Services [Doc. 132-1, p. 16].

visit to the Smiths' residence was required for DHS to complete its investigation.  "[T]he mere fact that a suspect has to choose between two lawful, albeit distasteful, options does not render that choice coerced."  *United States v. Polly,* 630 F.3d 991, 999 (10th Cir. 2011).

Looking to the other circumstances surrounding Mrs. Smith's consent, there is no evidence that the Smiths were physically mistreated or that the deputies threatened to use violence.  Nor is there any indication that the Smiths lacked mental capacity or were intoxicated at the time.  There were only two officers on the scene—Deputy Burnett and Deputy Peters.  Although Deputy Burnett had a firearm and handcuffs on her person, there is no evidence that the firearm was drawn.  Although the deputies did not explicitly advise the Smiths that they could refuse consent, "[t]he Supreme Court has held that a defendant's consent to a search may be voluntary even when the consenting party was not informed he could refuse."  *United States v. Carbajal-Iriarte,* 586 F.3d 795, 799 (10th Cir. 2009).  Further, Deputy Burnett advised Mrs. Smith that they could wait until the DHS investigator arrived to enter the residence.  During the course of the entry, the Smiths were not handcuffed and free to move about the home, "a fact that greatly undercuts [the Smiths'] protestation that [they were] merely submitting to 'a claim of lawful authority.'"  *Jones,* 701 F.3d at 1320.

Finally, and significant to this court, the undisputed evidence demonstrates that the Smiths acquiesced to the deputies' further entry into the residence.  Specifically, the evidence demonstrates that, upon entering the home, Deputy Peters asked Mrs. Smith the location of H.M.'s room.  Mrs. Smith escorted the deputies down the hall to a bedroom on the left and opened the door.  A reasonable officer would construe Mrs. Smith's conduct as signaling consent to enter H.M.'s room.  *See Jones,* 701 F.3d at 1312.  Likewise, after exiting H.M.'s room, Deputy Burnett asked Mrs. Smith about the room directly across from H.M.'s room, which Mrs. Smith described

as a junk room.  Deputy Burnett asked if she could look inside and Mrs. Smith explicitly advised that she could.  Again, a reasonable officer would believe that Mrs. Smith was authorizing them to enter the "junk room."  Finally, Deputy Burnett asked Mrs. Smith if she could look in the Smiths' bedroom, and Mrs. Smith again explicitly advised yes.

Considering the totality of the circumstances and the undisputed facts, "the only objectively reasonable conclusion [this court] can draw is that [defendants'] consent was freely and voluntarily given." *Jones,* 701 F.3d at 1320.  The Smiths' motions, insofar as they challenge the first April 5, 2019 entry, are denied.

B.     *Second Entry*

The Smiths next argue that the second entry into their home on April 5 was a non-consensual, warrantless search.  In response, the government contends that the Smiths consented.

As set forth above, the government bears the burden to prove that consent was freely and voluntarily given by a preponderance of the evidence.  *See Jones,* 701 F.3d at 1317; *Zubia-Melendez*, 263 F.3d at 1160.  The government provides no evidence that Mrs. Smith explicitly consented to the search.  In the response briefs, the government directs the court to the testimony of Investigator Wood during the state preliminary hearing on October 7, 2019.  During that hearing, Investigator Wood was questioned as to whether she asked permission to enter the Smith residence. [Doc. 132-3, p. 158].  Investigator Wood began to explain that she "always ask[s] for permission" and that she spoke with the Smiths on the porch and told them it "was [DHS] protocol to always do a walk through of the home and—." *Id.*  However, the testimony relates only to permission for Wood, as a representative of DHS, to enter the home.  The government presents no evidence that Inspector Wood or Deputy Burnett sought the Smiths' permission for Deputy Burnett to enter the home a second time.  Further, Investigator Wood was interrupted prior to indicating whether or

14

not the Smiths provided explicit consent.  For these reasons, the government has not shown by a preponderance of the evidence that the Smiths explicitly consented.

Looking to implicit consent, the only evidence submitted is that Investigator Wood entered the Smith residence to conduct a walk through with Mrs. Smith.  Deputy Burnett accompanied them.  [Doc. 132-1, p. 18; Doc. 132-3, pp. 123, 157-58].  As previously stated, the government presents no evidence that the Smiths were asked to consent to *Deputy Burnett's* entry into the home for a second time.  Further, unlike with respect to the first entry, the government presents no evidence that Mrs. Smith (or Mr. Smith) led Deputy Burnett and Inspector Wood into the home or otherwise gestured for officers to entered.  The evidence is simply that Deputy Burnett and Inspector Wood entered.  The government presents no other evidence regarding the circumstances surrounding Deputy Burnett's entry.  Based on the evidence presented, the government has not satisfied its burden to show affirmative acts or statements by either of the Smiths that a reasonable officer would have interpreted as signaling consent or authorization for Deputy Burnett to enter the home for a second time.  *Cf. Jones,* 701 F.3d at 1321.

The government does not argue that any other exception to the warrant requirement applies.  Thus, the second entry constitutes a warrantless search to which no exception applies, and it is presumed unreasonable.  Evidence obtained during the second entry of the Smiths' residence on April 5, 2019 must therefore be suppressed.

C.      *Third Entry*

The Smiths also challenge Deputy Burnett's third entry into the residence on April 5, 2019, as a non-consensual warrantless search.  The court agrees.  The *only evidence* presented is that, after exiting the Smith residence for a second time, the Smiths were questioned as to the location of the handcuffs.  Mr. Smith stated that he would go get them and Deputy Burnett told him "that

[she] would go with him."  [Doc. 132-1, p. 18].  "[T]he . . . test for determining the validity of consent to search requires a factual determination based upon the totality of the circumstances of whether the consent was the product of an 'essentially free and unconstrained **choice** by [the] maker' or whether it was the product of 'duress or coercion, express or implied.'"  *United States v. Sawyer*, 441 F.3d 890, 895 (10th Cir. 2006) (emphasis added) (*Schneckloth*, 412 U.S. at 225). Based on the evidence submitted, the court cannot reasonably conclude that any alleged consent by Mr. Smith was the product of a "free and unconstrained choice."  Rather, based on Deputy Burnett's affirmative statement that she "was going with him," the evidence submitted suggests that Mr. Smith had no choice at all.  Thus, the government has not satisfied its burden to show that the Smiths voluntarily consented to Deputy Burnett's third entry into the home.

In response, the government argues that, even if the search was involuntary, suppression of the evidence is not warranted based upon the inevitable discovery doctrine as law enforcement "would have sought and obtained a search warrant, which would have inevitably led to the discovery of the handcuffs in the closet of the master bedroom."  [Doc. 132, p. 12].

The Tenth Circuit has explained the inevitable discovery doctrine as follows:

> Subject to a few exceptions, evidence obtained in violation of the Fourth Amendment will be suppressed under the exclusionary rule; the inevitable discovery doctrine is one such exception.  *United States v. Cunningham,* 413 F.3d 1199, 1203 (10th Cir. 2005).  Under it, illegally obtained evidence may be admitted if it "ultimately or inevitably would have been discovered by lawful means."  *Nix v. Williams,* 467 U.S. 431, 444, 104 S. Ct. 2501, 81 L.Ed.2d 377 (1984).  The government bears the burden of proving by a preponderance of the evidence that the evidence would have been discovered without the Fourth Amendment violation. *Cunningham,* 413 F.3d at 1203.

*United States v. Christy,* 739 F.3d 534, 540 (10th Cir. 2014).  In cases where the government asserts that a valid search warrant would have been obtained, the Tenth Circuit has adopted four

factors to consider to determine "how likely it is that a warrant would have been issued and that the evidence would have been found pursuant to the warrant":

> 1) the extent to which the warrant process has been completed at the time those seeking the warrant learn of the search; 2) the strength of the showing of probable cause at the time the search occurred; 3) whether a warrant ultimately was obtained, albeit after the illegal entry; and 4) evidence that law enforcement agents "jumped the gun" because they lacked confidence in their showing of probable cause and wanted to force the issue by creating a fait accompli.

*Christy,* 739 F.3d at 541 (quoting *United States v. Souza*, 223 F.3d 1197, 1204 (10th Cir. 2005)). The court separately considers each factor.

First, the government submits no evidence that law enforcement had begun the warrant process at the time of the third entry into the residence on April 5, 2019.  The absence of evidence with respect to this factor weighs against application of the inevitable discovery doctrine,

Second, based on its review of the evidence submitted, even without the evidence obtained during the second and third entries into the residence, the court concludes that strong probable cause existed that the Smiths had committed the crimes of child abuse and child neglect.  However, "inevitable discovery does not apply when the government's only argument is that it had probable cause at the time of the search."  *Christy,* 739 F.3d at 543; *see also United States v. Logan*, No. 20-3202, 2022 WL 3349234, at *4 (10th Cir. Aug. 15, 2022) ("[P]robable cause alone is insufficient to apply inevitable discovery.").  Rather, "probable cause plus a chain of events that would have led to a warrant (or another justification) independent of the search" is required.  *Souza,* 223 F.3d at 1204 (quoting *United States v. Brown*, 64 F.3d 1083, 1085 (7th Cir. 1995)).

Third, a search warrant was ultimately obtained and executed.  *See* [Doc. 137-5; Doc. 137-6].  Taken together, the second and third factors weigh in favor of inevitable discovery.

Finally, the parties have submitted no evidence regarding law enforcement's level of confidence in obtaining a warrant or whether they wished to force the issue by creating a fait accompli. Thus, this factor is neutral.

Additionally, the court notes that the Tenth Circuit has directed that the court "apply the inevitable discovery doctrine 'only when it has a high level of confidence' that the warrant would have been issued *and the evidence obtained*." *Christy,* 739 F.3d at 541-42 (emphasis added) (quoting *Souza*, 223 F.3d at 1205). Thus, the Tenth Circuit has "recognize[d] the danger of admitting unlawfully obtained evidence 'on the strength of some judge's speculation that it would have been discovered legally anyway.'" *United States v. Owens*, 782 F.2d 146, 152-53 (10th Cir. 1986) (quoting *United States v. Romero*, 692 F.2d 699, 704 (10th Cir. 1982)).

Several factors suggest that the handcuffs may not have inevitably discovered pursuant to a valid search warrant. The undisputed facts demonstrate Mr. Smith moved the handcuffs between Deputy Burnett's first and second entry into the Smith residence. Yet, there is no evidence that Deputy Burnett attempted to secure the home or any evidence therein prior to her departure on April 5, 2019. Rather, the evidence indicates that Deputy Burnett spoke to the Smiths, did not arrest them, then left with Inspector Wood. Accordingly, the Smiths could have removed the handcuffs from the home or hidden them in a location such that they would not have been discovered during a search by law enforcement. Further, the government submits no evidence of the Mayes County Sheriff Office's standard protocol for searching and if it would have required officers to search the pockets of every pair of pants hanging in the closet. Finally, the search did not occur until April 19, 2019, two weeks after Deputy Burnett's initial contact with the Smiths, leaving plenty of time to hide or destroy the evidence.

Based on the evidence submitted, the government has not satisfied its burden and the court is not left with "high level of confidence" that the evidence, specifically the handcuffs, would have been obtained during a lawful search pursuant to a warrant. Thus, the inevitable discovery doctrine is inapplicable. The government offers no other exception to the exclusionary rule. Because the third entry was warrantless and presumptively unreasonable, and no exception to the exclusionary rule applies, evidence of the third entry into the Smith residence on April 5, 2019 must be suppressed.

### D.     *April 19, 2019 Search Pursuant to Warrant*

Finally, the Smiths challenge the April 19, 2019 search pursuant to warrant arguing that the information in the Affidavit for Search warrant was stale and fruit of the poisonous tree.

Looking first to the Smiths' contention that the information was stale, "[a] search warrant must be based on probable cause," and "[p]robable cause cannot be based on stale information that no longer suggests that the items sought will be found in the place to be searched." *United States v. Wagner,* 951 F.3d 1232, 1246 (10th Cir. 2020) (internal quotations omitted). "Probable cause is not determined by merely counting the number of days from the facts relied upon and the issuance of a warrant; rather, circumstances must exist from which it may be inferred that the grounds for the warrant will continue up to the time of the search." *United States v. Grubb*, 83 F.3d 434, at *3 (10th Cir. 1996) (table decision) (internal citation omitted).[6] "Whether information is too stale to establish probable cause depends on the nature of the criminal activity, the length of the activity, and the nature of the property to be seized." *United States v. Garcia*, 707 F.3d 1190, 1194-95 (10th Cir. 2013) (quoting *United States v. Shomo*, 786 F.2d 981, 983 (10th Cir. 1986)). "Thus, where the property sought is likely to remain in one place for a long time, probable cause

---

[6] "Unpublished decisions are not precedential, but may be cited for their persuasive value." 10th Cir. R. 32.1(A).

may be found even though there was a substantial delay between the occurrence of the event relied on and the issuance of the warrant." *Garcia*, 707 F.3d at 1195 (quoting *Shomo,* 786 F.2d at 984).

In this case, a search warrant was issued for a residence located in Salina, Oklahoma to search for certain property, including a pack n' play, livestock sorting tools (often referred to as flags, buggy whips, paddle, sticks, etc.), brooms, diapers, any device on which information can be stored digitally or electronically, and letters and mail that prove residency.  [Doc. 137-4, p. 3]. Although these items are readily mobile, they are items that would "reasonably be expected to be kept in a person's residence for an extended period of time."  *Grubb*, 83 F.3d at *3.  Further, looking to the nature of the alleged criminal activity, child neglect in violation of Oklahoma law includes the failure or omission to provide adequate shelter.  *See* Okla. Stat. tit. 10A, § 1-1-105(49); Okla. Stat. tit. 21, § 843.5(C).  It may be reasonably inferred that law enforcement may find evidence of neglect, including inadequate shelter, at the child's former residence.  Finally, the alleged abuse and neglect allegedly continued over a period of years.  Under the circumstances, the information included in the Affidavit for Search Warrant was not too stale to support probable cause.

Turning next to the Smiths' contention that the information in the Affidavit was fruit of the poisonous tree, the Tenth Circuit has stated "[w]hen a warrant is tainted by some unconstitutionally obtained information, [the court will] nonetheless uphold the warrant if there was probable cause absent that information." *United States v. Bullcoming,* 22 F.4th 883, 890 (10th Cir. 2022) (quoting *United States v. Sims*, 428 F.3d 945, 954 (10th Cir. 2005)).  Put another way, "[a]n affidavit containing erroneous or unconstitutionally obtained information invalidates a warrant if that information was critical to establishing probable cause.  If, however, the affidavit contained sufficient accurate or untainted evidence, the warrant is nevertheless valid." *Id*. at 891.

The court has reviewed the Affidavit for Search Warrant dated April 17, 2019. [Doc. 137-4]. Excluding the information obtained from the second and third entries into the Smith residence on April 5, 2019, the Affidavit included sufficient information to establish probable cause. Thus, inclusion of the unconstitutionally obtained information from the second and third entries does not invalidate the warrant.

Finally, as set forth by the government in its response, even if the warrant contained insufficient information to establish probable cause, the good-faith exception to the exclusionary rule applies.

"Under the good-faith exception to the exclusionary rule, if a warrant is not supported by probable cause, the evidence seized pursuant to the warrant need not be suppressed if the executing officer acted with an objective good-faith belief." *United States v. Chambers*, 882 F.3d 1305, 1310 (10th Cir. 2018) (quoting *United States v. Edwards*, 813 F.3d 953, 970 (10th Cir. 2015)). "Reliance upon a warrant issued by a neutral magistrate creates a 'presumption . . . [that] the officer is acting in good faith.'" *Chambers,* 882 F.3d at 1310 (quoting *United States v. Cardall*, 773 F.2d 1128, 1133 (10th Cir. 1985)). However, the presumption is "not absolute"—"[a]n 'officer's reliance on the defective warrant still must be objectively reasonable.'" *Chambers,* 882 F.3d at 1310 (quoting *United States v. Russian,* 848 F.3d 1239, 1246 (10th Cir. 2017)). "An affidavit has enough factual support to justify reliance if it establishes a minimally sufficient nexus between the illegal activity and the place to be searched." *Id.* at 1311 (emphasis altered from original).

The Affidavit for Search Warrant includes Deputy Burnett's personal observations of H.M. that she smelled strongly of urine and feces and appeared dirty. Deputy Burnett also averred that she observed a circumferential laceration around H.M.'s right ankle, which appeared to be infected. Deputy Burnett included H.M.'s statement that the injury was caused by a handcuff used

21

to secure her to a pack n' play so she could not get up at night.  The Affidavit also includes H.M.'s disclosures to Deputy Burnett that her parents, Mr. and Mrs. Smith, allegedly withheld meals from her, made her to wear a diaper but only changed it once or twice a day, and hit her with a belt, hand, or other items.  Finally, the affidavit included Deputy Burnett's personal observations of a pack n' play and handcuffs in the Smith residence—the location to be searched.  Based on the foregoing, the affidavit establishes a minimally sufficient nexus between the alleged abuse/neglect of H.M. and the residence in Salina, Oklahoma.  Accordingly, it was objectively reasonable for police officers to believe that the warrants were supported by probable cause.  Thus, the good faith exception applies.

Based on the foregoing, the Affidavit for Search Warrant included sufficient, non-stale, untainted information to establish probable cause.  And, even if it didn't, the good-faith exception to the exclusionary rule applies.  For these reasons, the motion to suppress evidence obtained from the April 19, 2019 search pursuant to search warrant must be denied.

### Conclusion

WHEREFORE, the Motion to Suppress Evidence [Doc. 61] of defendant Amanda Irene Smith and the Motion to Suppress Illegally Obtained Evidence [Doc. 122] of defendant Joel Richard Smith are granted in part and denied in part.  The Smiths' motions are granted as to the second April 5, 2019 entry.  Mrs. Smith's motion, in which Mr. Smith has joined, is granted as to the third April 5, 2019 entry.  The motions are otherwise denied.

IT IS SO ORDERED this 7th day of June, 2023.

Gregory K. Frizzell
United States District Judge
Northern District of Oklahoma